## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Eric Goldstein, Matt Sudol, and Bonnie Zelazek, individually and as representatives of a class of similarly situated persons, and on behalf of the Mutual of America Life Insurance Company Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> Mutual of America Life Insurance Company, <br><br> Defendant. | Case No. 22-cv-7862 <br><br><br> **CLASS ACTION COMPLAINT** |

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs Eric Goldstein, Matt Sudol, and Bonnie Zelazek, individually and as representatives of the Class described below, and on behalf of the Mutual of America Life Insurance Company Savings Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendant Mutual of America Life Insurance Company ("Mutual of America" or "Defendant"). At the expense of the Plan and its participants and beneficiaries, Mutual of America breached its fiduciary duties with respect to the Plan in violation of ERISA. By using its own proprietary recordkeeping platform and by failing to monitor or control the Plan's administrative expenses, Mutual of America caused plan participants to pay excessive administrative fees. Mutual of America also applied an imprudent and disloyal preference for its own proprietary funds within the Plan ("Mutual of America Funds"), despite their poor performance and high costs. Mutual of America's imprudent and disloyal conduct has cost plan participants millions of dollars over the putative class

period.[1] Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2. As of March 2022, Americans had invested approximately $10.4 trillion in defined contribution plans (401(k) and 403(b) plans).[2] Defined contribution plans have largely replaced defined benefit plans (pension plans), which were predominant in previous generations.[3]

3. Defined contribution plans provide greater potential for disloyalty and imprudence than defined benefit plans. In a defined benefit plan, the participant is entitled to a "fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (quotation omitted). As the employer must ensure the plan is sufficiently capitalized to make these payments, the employer bears all risks related to excessive fees and investment underperformance. *See id.* 439–40. Consequently, defined-benefit-plan employers and fiduciaries have every incentive to keep costs low and remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). As the employee bears all risks related to excessive fees and investment underperformance, the employer has no incentive to keep costs low or remove imprudent investments.

---

[1] The putative class period is "any time on or after September 14, 2016." *Infra* ¶ 57.
[2] *See* Investment Company Institute, *Retirement Assets Total $37.5 Trillion in First Quarter 2022* (June 15, 2022), https://www.ici.org/statistical-report/ret_22_q1.
[3] *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply*, at 4 (July 24, 2014), http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx; Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: Data in Brief*, at 4 (last updated Nov. 23, 2021), https://fas.org/sgp/crs/misc/R43439.pdf.

4.     For companies that provide retirement plan investments or services (like Mutual of America), the potential for imprudent and disloyal conduct is especially high because the plan's fiduciaries can benefit the company through their administration of the plan by, for example, using proprietary investments or services that a non-conflicted and objective fiduciary would not choose.

5.     To protect retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B).

6.     Mutual of America has not acted in participants' best interest. To the contrary, Mutual of America used the Plan to promote Mutual of America's proprietary services and investments and earn profits for Mutual of America. Throughout the putative class period, Mutual of America used its own proprietary closed-architecture recordkeeping platform, causing participants to pay annual administrative fees roughly *ten times higher* than what participants would have paid for administrative services had Mutual of America diligently investigated the marketplace and hired a third-party recordkeeper to provide either the same set of services or services of superior quality.

7.     The use of Mutual of America's closed-architecture recordkeeping platform was advantageous to Mutual of America in other ways as well, as its platform is filled with Mutual of America's proprietary investments. Indeed, as of the end of 2020, Mutual of America stocked the Plan's investment menu with 29 proprietary investments: 1 proprietary fixed interest account and 28 proprietary mutual funds. A prudent and objective review of comparable investments in the

3

marketplace would have revealed numerous available investments that were less costly and superior to the Mutual of America Funds that Mutual of America selected and retained in the Plan. But instead of investing in any of these competitive fund offerings in the marketplace, Mutual of America invested in its proprietary funds, which charged fees far more than similar marketplace alternatives that were available. Mutual of America's decision generated significant profits for Mutual of America.

8.     Mutual of America's imprudent and disloyal conduct has cost the Plan and its participants millions of dollars in excessive fees and lost investment returns since the start of the putative class period.

9.     Based on Mutual of America's actions and omissions, Plaintiffs assert a claim against Mutual of America for breaching its fiduciary duties of loyalty and prudence. In connection with this claim, Plaintiffs seek to recover all losses to the Plan resulting from Mutual of America's fiduciary breaches, all profits earned by Mutual of America in connection with its breaches or the Plan's assets, and other appropriate relief.

## **JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) and (3), which permit participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

11.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

12.     Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Mutual of America may be found.

## THE PARTIES

### PLAINTIFFS

13.     Plaintiff Eric Goldstein resides in New York, New York. He has participated in the Plan since 2005 and is a current participant. As a Plan participant, he has paid excessive administrative expenses during the putative class period. Plaintiff Goldstein has also been invested in at least the Mutual of America Mid-Cap Equity Index fund, Mutual of America Small Cap Growth fund, Mutual of America Aggressive Allocation fund, Mutual of America Small Cap Value fund, and Mutual of America Moderate Allocation fund during the putative class period. As a result, he has been financially injured by Mutual of America's unlawful conduct. Plaintiff Goldstein's account would be worth more today had Mutual of America not violated ERISA as described herein.

14.     Plaintiff Matt Sudol resides in Ridgewood, New Jersey. He was a participant in the Plan from approximately 2016 until 2022. As a Plan participant, he has paid excessive administrative expenses during the putative class period. Plaintiff Sudol has also been invested in at least the Mutual of America 2040 Retirement fund, Mutual of America All America fund, Mutual of America Equity Index fund, the Mutual of America Aggressive Allocation fund, the Mutual of America Bond fund, and the Mutual of America Moderate Allocation fund during the putative class period. As a result, he has been financially injured by Mutual of America's unlawful conduct. Plaintiff Sudol's account would be worth more today had Mutual of America not violated ERISA as described herein.

15.     Plaintiff Bonnie Zelazek resides in Lake Worth, Florida. She was a participant in the Plan from approximately 1988 until 2021. As a Plan participant, she paid excessive administrative expenses during the putative class period. Plaintiff Zelazek was also invested in at least the Mutual of America All America fund, Mutual of America Equity Index fund, Mutual of

America Mid-Cap Equity Index fund, Mutual of America Small Cap Growth fund, and Mutual of America Small Cap Value fund during the putative class period. As a result, she has been financially injured by Mutual of America's unlawful conduct. Plaintiff Zelazek's account would have been worth more at the time it was distributed from the Plan had Mutual of America not violated ERISA as described herein.

## THE PLAN

16.     The Plan was established on July 1, 1985.

17.     The Plan covers eligible employees and former employees of Mutual of America.

18.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

19.     From 2016 through the end of 2020 (the last year for which data is publicly available), the Plan had between 1,800 and 2,000 participants and approximately $274 million to $436 million in assets.

20.     Plan participants may direct their accounts to one or more investments selected by the Plan's fiduciaries. The Plan's investments are held in a group annuity contract administered by Mutual of America. Almost all these investments are mutual funds held within a group annuity subaccount vehicle, which is also sometimes referred to as a separate account. The exception to this is the Mutual of America's proprietary fixed interest account.

21.     As of the end of 2016, the Plan's investment menu consisted of 40 investments, 26 of which were proprietary Mutual of America funds (including a suite of proprietary target date funds and index funds). From 2016 until 2020, Mutual of America did not remove a single one of these 26 proprietary investments from the Plan's menu. In fact, it added 3 additional proprietary

investments,[4] as well as some non-proprietary investments. So, by the end of 2020, the Plan's menu consisted of 50 investments including 29 proprietary Mutual of America funds.

22.     Plan participants pay expenses associated with administering the Plan, including recordkeeping and administrative fees. One way that participants pay these fees is through a charge (a percentage of the participant's assets in the plan), which is added on top of the expense ratio associated with the Plan's investments. Certain participants also paid a monthly fee intended to cover part of the cost of administering the Plan's group annuity contract and each participant's account.

**DEFENDANT**

23.     Defendant Mutual of America Life Insurance Company is an insurance company headquartered and incorporated in New York. Mutual of America also provides retirement plan services to the small retirement plan market, including many small non-profit companies.

24.     The Plan's Forms 5500 (filed with the United States Department of Labor) identify Mutual of America as the plan sponsor. *See* 29 U.S.C. § 1002(16)(B) (defining plan sponsor). As the plan sponsor, Mutual of America has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Mutual of America exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

25.     The Plan's Forms 5500 also identify Mutual of America as the plan administrator. *See* 29 U.S.C. § 1002(16)(A) (defining plan administrator). As the plan administrator, Mutual of

---

[4] The Mutual of America Small Cap Equity Index Fund was added in 2018, the Mutual of America 2060 Retirement Fund was added in 2018, and the Mutual of America 2065 Retirement Fund was added in 2020.

America is a named fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

26.     To the extent that Mutual of America has delegated any of its fiduciary functions to others, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D- 4); *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power." (quotation omitted)).

## LEGAL AND FACTUAL BACKGROUND

### ERISA FIDUCIARY DUTIES

27.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)     for the exclusive purpose of

(i)     providing benefits to participants and their beneficiaries; and

(ii)     defraying reasonable expenses of administering the plan;

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

8

such matters would use in the conduct of an enterprise of like character and with like aims . . . .

28.     These ERISA fiduciary duties are "the highest known to the law." *Donovan*, 680 F.2d at 272 n.8. "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 339 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020).

### DUTY OF LOYALTY

29.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan*, 680 F.2d at 271). "Perhaps the most fundamental duty of a [fiduciary] is that [it] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added). "Breaches of the unwavering duty of loyalty occur when a fiduciary deviates from that single-minded devotion, placing its interests … above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (quotation omitted).

## DUTY OF PRUDENCE

30.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). "[A] fiduciary's conduct at all times must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *Sweda*, 923 F.3d at 333 (quotation omitted). "[I]f there is indeed a 'hallmark' of fiduciary activity identified in the statute, it is prudence." *Id.*

31.     The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); *see also Vellali*, 308 F. Supp. 3d at 683 ("Fiduciaries have a continuing duty … to monitor investments and remove imprudent ones." (quotation omitted)). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). The duty of prudence necessarily entails consideration of investment costs. *See Sweda*, 923 F.3d at 328-29 ("Fiduciaries must … consider a plan's power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." (quotation omitted)).

## DUTY TO MINIMIZE COSTS

32.     At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "The process of selecting vendors and negotiating service fees can materially affect an employee's retirement income because every dollar spent on either recordkeeping or investment management is a dollar that is not contributing to increasing the amount of the employee's retirement savings. Over time, excessive service fees

can erode an employee's retirement savings to the tune of tens or hundreds of thousands of dollars." *Vellali*, 308 F. Supp. 3d at 678.[5]

33. Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of a plan's largest expenses. Within the world of defined contribution plans, "recordkeeping" is a catch-all term that describes an array of services provided by a plan's primary administrative service provider that typically includes, but is not limited to, processing and tracking all balances and transactions associated with each participant's account; updating account balances daily; providing a web portal to participants providing them with up-to-date account, investment, and financial planning information; providing communications to participants including periodic account statements and required disclosures; processing participant loans; affording employees various financial education opportunities; compliance testing for the plan; 5500 preparation; preparing financial statements; and furnishing the Plan's fiduciaries with participant and investment information to assist with their administration of the plan. In this case, the administrative fees charged to participants additionally cover the cost of administering the Plan's group annuity contract.

34. To protect retirement plan participants, ERISA requires plan fiduciaries to monitor administrative expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the

---

[5] The DOL and SEC have also warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2 (2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d at 328 ("Fiduciaries must … understand and monitor plan expenses."); *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *5 (D. Conn. Apr. 18, 2022) ("[A] plan fiduciary's duty of prudence incorporates an ongoing duty to monitor the prudence of investment options and recordkeeping fees, in order to be cost-conscious in administering their duties."); *accord* Restatement (Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious.").[6]

35.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses, including recordkeeping fees, should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (Plaintiffs sufficiently alleged that administrative expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties." (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005))).

36.     A fiduciary may breach its duties by authorizing higher-than-market administrative fees or maintaining a recordkeeping deal for its own benefit. *See Vellali*, 308 F. Supp. 3d at 685 (denying a motion to dismiss where the complaint alleged defendants' failures caused excessive

---

[6] The legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

administrative fees); *Carrigan*, 2022 WL 1137230, at *5 ("Plaintiffs have plausibly alleged that [d]efendants breached the duty of prudence by retaining affiliated recordkeepers that charged excessive fees under circumstances that would have alerted a reasonably prudent fiduciary of the need to investigate further.").

## **DEFENDANT'S VIOLATIONS OF ERISA**

I.  **MUTUAL OF AMERICA USED ITS PROPRIETARY RECORDKEEPING PLATFORM TO GENERATE PROFITS FOR ITSELF AT PARTICIPANTS' EXPENSE AND FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S ADMINISTRATIVE EXPENSES**

37.     Among large plans, the market for recordkeeping services is highly competitive, with many recordkeepers equally capable of providing a high-level service. Accordingly, recordkeepers vigorously compete for business by offering the best price. As a result of such competition, recordkeeping fees have declined in defined contribution plans over time. Between 2006 and 2016, recordkeeping costs dropped by approximately 50% on a per-participant basis and have continued to decline since then.[7] As the cost of providing recordkeeping services depends on the number of participants in a plan, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

38.     A defined contribution plan can be recordkept using either an open or a closed architecture recordkeeping platform. Every major recordkeeper in the marketplace offers an open-architecture platform, which allows for plan fiduciaries to build a plan's investment menu by selecting from any of the thousands of mutual funds and collective investment trusts in the marketplace. Mutual of America, however, offers a closed-architecture recordkeeping platform to

---

[7] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019), https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC."); Robert Steyer, *Record-keeping Consolidation Expected to Continue*, Pensions & Investments (Oct. 22, 2020) (noting the continued declines in recordkeeping expenses).

its clients. This closed-architecture recordkeeping platform limits a plan's investment menu to one of the approximately 50 investment options that Mutual of America makes available, including numerous Mutual of America proprietary investments. While it is not per se imprudent to use a proprietary closed-architecture recordkeeping platform, plan fiduciaries must monitor and control recordkeeping expenses, which includes investigating the recordkeeping options available to a plan.

39.     From at least 2016 through 2021, Mutual of America used its own proprietary closed-architecture recordkeeping platform for the Plan. By selecting itself as the Plan's recordkeeper, Mutual of America benefitted from the Plan's administration. But Mutual of America's selection severely limited the Plan's investment menu and caused plan participants to pay excessive administrative expenses during the putative class period.

40.     Specifically, in 2016, Mutual of America caused plan participants to pay an average annual administrative and recordkeeping fee of approximately $350 per person. And, by 2020, participants were paying an average of approximately $500 per person,[8] which was up to *ten times higher* than what participants would have paid for administrative services had Mutual of America diligently investigated the marketplace options and hired a third-party recordkeeper to provide either the same set of services or services of superior quality.

41.     Based on Plaintiffs' investigation, a prudent and loyal fiduciary of a similarly sized plan could have obtained comparable administrative services for approximately $50-80 per participant (or less) at that time. It was not prudent or in the best interest of participants to allow the Plan to be charged up to ten times more than this amount.

---

[8] Annual administrative and recordkeeping fees are a combination of a monthly fee charged to certain participants' accounts as well as an asset-based fee added on to the expense ratio of the Plan's investment options.

42.     A prudent and loyal fiduciary would not have allowed the Plan to pay these excessive amounts for administrative and recordkeeping services. As part of a prudent fiduciary process, fiduciaries regularly monitor the amount of administrative expenses that are being paid and conduct periodic cost benchmarking to determine whether those amounts are consistent with the amounts paid by other similarly sized plans. And prudent fiduciaries submit requests for proposals (RFPs) to potential service providers at least every few years to obtain competitive information and survey possible alternatives. Based on the excessive amounts the Plan paid for administrative services, it is reasonable to infer that Mutual of America failed to take these measures.

## II.    MUTUAL OF AMERICA'S PROCESS FOR SELECTING AND MONITORING INVESTMENTS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST

43.     Although including proprietary options in a plan's investment menu is not a per se breach of the duty of prudence or loyalty, a fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties that apply to the selection and monitoring of other investments. Based on Mutual of America's retention of proprietary funds in lieu of less expensive and otherwise superior nonproprietary fund alternatives, it is reasonable to infer that Mutual of America's process for selecting and monitoring the Mutual of America Funds was imprudent and disloyal.

44.     Each of the Mutual of America Funds charge an annual operating expense that is paid to Mutual of America and deducted from the rate of return of the fund. In addition to receiving these investment management fees, and because the Mutual of America Funds are structured as separate accounts, Mutual of America also claims a tax deduction called the Dividend Received Deduction ("DRD") on dividends received on the assets owned by Mutual of America on behalf of the Plan. *See* 26 U.S.C. § 243. For insurance companies with large separate accounts such as

Mutual of America, this DRD tax benefit can be worth millions of dollars. If Mutual of America had not invested the Plan's assets in the Mutual of America Funds, Mutual of America would have received significantly less money from investment management fees and the DRD tax benefit.

45.    As shown by the charts below, the actively managed Mutual of America Funds are considerably more expensive than readily available marketplace alternatives.[9] In 2018, the most recent year for which average fee data is available, the actively managed Mutual of America Funds exceeded the average expense ratio for funds within the same asset class category among plans with $250 million to $500 million in assets by as much as 93%.[10] When looking solely at leading actively managed funds invested in similar styles to the actively managed Mutual of America Funds, the excessive fees reach as high as 36% above average:

---

[9] Actively managed Mutual of America Funds exclude the Mutual of America funds which employ, in part or in whole, passively managed strategies. This includes the Mutual of America target date funds, Mutual of America Conservative Allocation fund, Mutual of America Moderate Allocation fund, Mutual of America Aggressive Allocation fund, Mutual of America All America fund, Mutual of America International fund, Mutual of America Mutual of America Equity Index fund, Mutual of America Mid-Cap Equity index fund, and Mutual of America Small-Cap Equity index fund.

[10] The expenses listed for Mutual of America Funds exclude any asset-based administrative fees added to each Fund's expense ratio. That is, the Mutual of America Funds' fees are excessive even when focusing solely on the portion of the Funds' expense ratios represented by the annual report and/or prospectus net expense ratios. The actual expense ratios paid by participants investing in the Mutual of America Funds are approximately 0.25% ***higher*** than illustrated here.

| Proprietary Fund | ICI/BrightScope Category / Morningstar Global Category | Fund Net Expense Ratio (2018) | Average 401(k) Fund Expense Ratio (2018) | Percentage Fee Excess Over 401(k) Average | Average Actively Managed Expense Ratio (2018)[11] | Percentage Fee Excess Over Actively Managed Average |
|---|---|---|---|---|---|---|
| **Mutual of America Composite** | Non-Target Date Balanced / Moderate Allocation | 0.51% | 0.39% | 31% | 0.56% | -9% |
| **Mutual of America Bond** | Domestic Bond / U.S. Fixed Income | 0.45% | 0.34% | 32% | 0.33% | 36% |
| **Mutual of America Mid Cap Value** | Domestic Equity / U.S. Equity Mid Cap | 0.65% | 0.42% | 55% | 0.62% | 5% |
| **Mutual of America Mid-Term Bond** | Domestic Bond / U.S. Fixed Income | 0.45% | 0.34% | 32% | 0.33% | 36% |
| **Mutual of America Small Cap Growth** | Domestic Equity / U.S. Equity Small Cap | 0.81% | 0.42% | 93% | 0.67% | 21% |
| **Mutual of America Small Cap Value** | Domestic Equity / U.S. Equity Small Cap | 0.81% | 0.42% | 93% | 0.67% | 21% |

46.     The Mutual of America Funds' excessive fees extend to the Plan's passively managed investments as well.[12] Less expensive index mutual funds designed to track the exact same prospectus benchmarks as the Mutual of America index funds were available throughout the putative class period:

---

[11] The "Actively Managed Average Expense Ratio" consists of the average annual report expense ratio of the least expensive share class of the twenty largest actively managed mutual funds by assets under management managed in a similar investment style. Averages are calculated separately for moderate allocation, U.S. fixed income, U.S. equity mid cap, and U.S. equity small cap Morningstar Global Categories.

[12] The Mutual of America Funds' net expense ratios shown exclude any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

| Index Fund | Prospectus Benchmark | Fund Net Expense Ratio (Current) |
|---|---|---|
| **Large Cap Equity Index Fund** | | |
| **Mutual of America Equity Index** | S&P 500 TR USD | 0.14% |
| **Vanguard Institutional Index I** | S&P 500 TR USD | 0.035% |
| **Mid-Cap Equity Index Fund** | | |
| **Mutual of America Mid-Cap Equity Index** | S&P MidCap 400 TR USD | 0.15% |
| **Vanguard S&P Mid-Cap 400 Index I** | S&P MidCap 400 TR USD | 0.08% |
| **Small Cap Equity Index Fund** | | |
| **Mutual of America Small-Cap Equity Index** | S&P SmallCap 600 TR USD | 0.15% |
| **Vanguard S&P Small-Cap 600 Index I** | S&P SmallCap 600 TR USD | 0.08% |

47.     In large part because of the high fees charged by the Mutual of America Funds, those investments tended to underperform, costing the Plan millions of dollars in lost benefits that participants otherwise would have had in their accounts if the Plan's investments had been managed in a prudent and loyal manner. One example of an imprudently retained fund is the Mutual of America Small Cap Growth fund, which has been in the Plan throughout the putative class period. Leading up to and throughout the relevant period, this fund has consistently and materially trailed its prospectus benchmark as well as less expensive funds that share the same prospectus benchmark and employ similar investment objectives and risk. Yet, Defendants never removed it from the Plan:

| Fund | Net Expense Ratio (Current) | 2016 (10-Year Return) | 2017 (10-Year Return | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) |
|---|---|---|---|---|---|---|---|
| **Mutual of America Small Cap Growth** | 0.81%[13] | 6.63% | 8.44% | 11.60% | 11.50% | 12.31% | 13.68% |
| ***Russell 2000 Growth TR USD*** | *n/a* | *7.76%* | *9.19%* | *13.52%* | *13.01%* | *13.48%* | *14.14%* |

---

[13] The Mutual of America Small Cap Growth fund's net expense ratio shown excludes any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ClearBridge Small Cap Growth IS** | 0.77% | 8.07% | 9.54% | 15.93% | 14.45% | 16.00% | 17.23% |
| **Invesco Discovery R6** | 0.63% | 8.77% | 9.10% | 14.18% | 15.05% | 16.96% | 17.75% |
| **JPMorgan Small Cap Growth R6** | 0.74% | 7.46% | 10.00% | 15.89% | 15.82% | 17.90% | 17.60% |

48.    Comparing the funds' alpha[14] to the fund's benchmark and suitable market alternatives shows that the Mutual of America Small Cap Growth fund's underperformance was caused by its managers' lack of skill—rather than the fund's risk profile:

| Fund | 2016 (10-Year Alpha)[15] | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha) |
|---|---|---|---|---|---|---|
| **Mutual of America Small Cap Growth** | -0.55 | 0.00 | -0.61 | -0.52 | -0.11 | 0.60 |
| **ClearBridge Small Cap Growth IS** | 0.84 | 1.04 | 3.49 | 2.31 | 3.04 | 3.40 |
| **Invesco Discovery R6** | 1.82 | 1.05 | 2.39 | 3.10 | 4.68 | 5.50 |
| **JPMorgan Small Cap Growth R6** | -0.33 | 0.59 | 1.75 | 1.95 | 3.45 | 2.69 |

49.    A prudent fiduciary would have removed the Mutual of America Small Cap Growth fund from the Plan given its significant underperformance leading up to and throughout the putative class period. The fact that Mutual of America retained this proprietary fund despite its

---

[14] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. *See* Investopedia, *Alpha*, https://www.investopedia.com/terms/a/alpha.asp (last visited Sep. 13, 2022).
[15] Alpha's calculation benchmark is the Russell 2000 Growth TR USD index, which serves as the prospectus benchmark for the Mutual of America Small Cap Growth fund as well as each comparator fund listed.

consistent underperformance versus its benchmark and readily available, superior marketplace alternatives supports an inference that Mutual of America's process for monitoring the Plan's investments was self-interested and imprudent.

50.    Another illustrative example of Mutual of America's flawed monitoring process is the retention of the Mutual of America Mid Cap Value fund, which has been in the Plan throughout the putative class period. Like the Mutual of America Small Cap Growth fund, the Mutual of America Mid Cap Value fund has failed to keep pace with its prospectus benchmark and similarly or less expensive funds that share prospectus benchmarks and employ similar investment objectives and risk:

| Fund | Net Expense Ratio (Current) | 2016 (10-Year Return) | 2017 (10-Year Return | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) |
|------|------|------|------|------|------|------|------|
| **Mutual of America Mid Cap Value** | 0.65%[16] | 6.03% | 7.42% | 10.07% | 10.22% | 8.63% | 12.13% |
| *Russell Mid Cap Value TR USD* | *n/a* | *7.59%* | *9.10%* | *13.03%* | *12.41%* | *10.49%* | *13.44%* |
| **MFS Mid Cap Value R6** | 0.63% | 7.60% | 8.83% | 13.53% | 12.80% | 10.61% | 13.87% |
| **T. Rowe Price Mid Cap Value I** | 0.65% | 8.40% | 9.55% | 13.04% | 10.77% | 10.14% | 13.16% |
| **Victory Sycamore Established Value R6** | 0.54% | 9.83% | 10.68% | 13.36% | 12.90% | 11.62% | 14.76% |

---

[16] The Mutual of America Mid Cap Value fund's net expense ratio shown excludes any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

51.     Likewise, the Mutual of America Mid Cap Value fund's underperformance is caused by its manager's lack of skill—not its risk profile—as exhibited through the fund's inferior alpha:

| Fund | 2016 (10-Year Alpha)[17] | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha) |
|---|---|---|---|---|---|---|
| Mutual of America Mid Cap Value | -0.51 | -0.28 | -1.06 | -1.25 | -1.17 | -0.65 |
| MFS Mid Cap Value R6 | 0.32 | 0.15 | 1.24 | 0.44 | 0.31 | 0.71 |
| T. Rowe Price Mid Cap Value I | 1.29 | 1.12 | 0.87 | -0.82 | 0.15 | 0.28 |
| Victory Sycamore Established Value R6 | 2.85 | 2.46 | 1.59 | 0.96 | 1.43 | 1.68 |

52.     Mutual of America failed to adequately investigate these marketplace alternatives when selecting and retaining funds for the Plan, choosing instead to use the Mutual of America Funds to further Mutual of America's interests. Mutual of America chose these proprietary funds even though they charged fees that were significantly higher than the fees charged by more competitive options that employed similar investment strategies and were managed in a similar style. Indeed, the excessive fees charged by the Mutual of America index funds were higher when compared to other index funds tracking identical prospectus benchmarks. If Mutual of America had been monitoring fund expenses and investigating marketplace alternatives consistent with the practice of other fiduciaries of 401(k) plans, then it would have replaced the Mutual of America

---

[17] Alpha's calculation benchmark is the Russell Mid Cap Value TR USD index, which serves as the prospectus benchmark for the Mutual of America Mid Cap Value fund as well as each comparator fund listed.

Funds with more competitive marketplace alternatives, like those listed above, all of which were available to Mutual of America.

53.     The high fees and poor performance of the Mutual of America Funds has rightfully led other similarly sized plan fiduciaries to look elsewhere for investment options available to their respective participants. For example, of the 3,967 defined contribution plans with at least $250 million in assets—like the Plan—only twelve additional plans hold a single Mutual of America fund. Of those twelve plans, no plan has allocated more than approximately 5% of its assets to Mutual of America funds, with the median allocation totaling a paltry 0.20% of plan assets. In stark contrast, the Mutual of America Funds comprise nearly **_two-thirds_** of total Plan assets.

54.     A prudent and loyal fiduciary would have removed the Mutual of America Funds from the Plan. By retaining the Mutual of America Funds and failing to investigate superior, lower-cost alternatives in the marketplace, Mutual of America has breached its fiduciary duties of loyalty and prudence.

### III.   PLAINTIFFS LACKED KNOWLEDGE OF MUTUAL OF AMERICA'S CONDUCT AND PRUDENT ALTERNATIVES

55.     Until shortly before this suit was filed, Plaintiffs did not know all of the material facts (including, among other things, the investment options and menu choices of fiduciaries of similarly sized plans, the costs of the Plan's investments compared to those in similarly sized plans, the availability of superior investment options, the cost of the Plan's administrative or recordkeeping services compared to similarly sized plans, and the Plan's leverage to negotiate lower administrative expenses) necessary to understand that Mutual of America breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA. Further, Plaintiffs did not have actual knowledge of the specifics of Mutual of America's decision-making processes with respect to the Plan (including Mutual of America's processes for selecting, monitoring,

evaluating, and removing Plan investments and Mutual of America's process for selecting and monitoring the Plan's service providers and monitoring the Plan's administrative expenses) because this information is solely within the possession of Mutual of America prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

56. Plaintiffs seek certification of this action as a class action under Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. § 1109 and 1132(a)(2).

57. Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[18]

> All participants and beneficiaries of the Mutual of America Life Insurance Company Savings Plan who were invested in the Mutual of America Funds at any time on or after September 14, 2016, excluding any persons with responsibility for the Plan's administrative functions or investments.

58. Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 1,800 and 2,000 participants at all relevant times during the applicable period, many of whom were invested in the Mutual of America Funds.

59. Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered financial harm because of Mutual of America's mismanagement of the Plan. Mutual of America treated Plaintiffs consistently with other Class members with regard to the Plan. Mutual of America's imprudent and disloyal decisions affected all Plan participants similarly.

---

[18] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

60.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

61.    <u>Commonality</u>: Common legal and factual questions exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

     a.   Whether Mutual of America is a fiduciary with respect to the Plan;

     b.   Whether Mutual of America breached its fiduciary duties by engaging in the conduct described herein;

     c.   The proper form of equitable and injunctive relief; and

     d.   The proper measure of monetary relief.

62.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Mutual of America would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Mutual of America.

63.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The

accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

64.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Mutual of America's conduct as described in this Complaint applies uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Mutual of America, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Mutual of America by any Class members on an individual basis. Class certification also will remove the need for unduly duplicative litigation that might result in inconsistent judgments concerning Mutual of America's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

65.     As alleged above, Mutual of America is a fiduciary with respect to the Plan and is subject to ERISA's fiduciary duties.

66.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Mutual of America in connection with its administration of the Plan; its selection and monitoring of the Plan's investments; its selection and monitoring of the Plan's recordkeeping platform; and its monitoring and control of the Plan's administrative expenses.

67.     Mutual of America breached these fiduciary duties by engaging in the conduct described herein. Among other things, Mutual of America caused the Plan to pay excessive administrative fees and failed to properly monitor and control administrative expenses, retaining a proprietary recordkeeping platform because doing so was in Mutual of America's financial interest. Mutual of America also failed to employ a prudent and loyal process for selecting, monitoring, and removing the Mutual of America Funds and gave an improper and unjustified preference to these funds over superior, less expensive alternative available options.

68.     Instead of acting in Plan participants' best interest, Mutual of America's conduct was propelled by a desire to drive revenues and profits to Mutual of America, and to promote Mutual of America's business interests. Accordingly, Mutual of America failed to discharge its duties with respect to the Plan solely in the interest of Plan participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of its fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

69.     Further, each of the actions and omissions described in paragraphs 67-68 above and elsewhere in this Complaint demonstrate that Mutual of America failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

70.     Because of Mutual of America's fiduciary breaches, the Plan and its participants suffered millions of dollars in losses throughout the putative class period.

71.     Mutual of America is liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from these fiduciary breaches, and to restore to the Plan any profits (including any DRD benefit) that Mutual of America captured through the use of Plan assets or which resulted from such fiduciary breaches. In addition, Mutual of America is liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Goldstein, Sudol, and Zelazek, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Mutual of America breached its fiduciary duties under ERISA;

D.     An order compelling Mutual of America to personally make good to the Plan all losses that the Plan incurred because of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.     An accounting for profits earned by Mutual of America, and a subsequent order requiring Mutual of America to disgorge all profits received from, or in respect of, the Plan;

F.     An order granting equitable restitution and other appropriate equitable monetary relief against Mutual of America including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Mutual of America because of Mutual of America's unlawful conduct in violation of ERISA, or a surcharge against Mutual of America to prevent unjust enrichment from unlawful conduct involving the Plan;

G.     An order enjoining Mutual of America from any further violations of ERISA;

H.     An order requiring replacement of certain investments in the Plan;

I.     An order requiring removal of certain investments from the Plan;

J.   An order requiring removal of the Plan's fiduciaries and replacement with an independent fiduciary;

K.   Other equitable relief to redress Mutual of America's illegal practices and to enforce the provisions of ERISA as may be appropriate;

L.   An award of pre-judgment interest;

M.   An award of attorneys' fees and costs under 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

N.   An award of such other and further relief as the Court deems equitable and just.

Dated: September 14, 2022                    **NICHOLS KASTER, PLLP**

By: s/ Paul J. Lukas
Paul J. Lukas, NY Bar No. 4522207
Brock J. Specht, MN Bar No. 0388343*
Grace I. Chanin, MN Bar No. 0399969*
*pro hac vice applications forthcoming*
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bspecht@nka.com
gchanin@nka.com