**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Eric Goldstein, Matt Sudol, and Bonnie Zelazek, individually and as representatives of a class of similarly situated persons, and on behalf of the Mutual of America Life Insurance Company Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Mutual of America Life Insurance Company, the Mutual of America Investment Manager Committee, and John and Jane Does 1-20,<br><br>Defendants. | Case No. 1:22-cv-7862-GHW-OTW<br><br><br>**AMENDED CLASS ACTION COMPLAINT** |

**NATURE OF THE ACTION**

1.      Plaintiffs Eric Goldstein, Matt Sudol, and Bonnie Zelazek, individually and as representatives of the Class described below, and on behalf of the Mutual of America Life Insurance Company Savings Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Mutual of America Life Insurance Company ("Mutual of America"), the Mutual of America Investment Manager Committee ("Committee"), and John and Jane Does 1-20 (collectively, "Defendants"). At the expense of the Plan and its participants and beneficiaries, Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA. By using Mutual of America's proprietary recordkeeping platform and by failing to monitor or control the Plan's administrative expenses, Defendants caused plan participants to pay excessive administrative fees. Defendants also applied an imprudent and disloyal preference for Mutual of America's proprietary funds within the Plan ("Mutual of America Funds"), despite their poor

1

performance and high costs. Defendants imprudent and disloyal conduct has cost plan participants millions of dollars over the putative class period.[1] Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of June 2022, Americans had invested approximately $9.3 trillion in defined contribution plans (401(k) and 403(b) plans).[2] Defined contribution plans have largely replaced defined benefit plans (pension plans), which were predominant in previous generations.[3]

3.      Defined contribution plans provide greater potential for disloyalty and imprudence than defined benefit plans. In a defined benefit plan, the participant is entitled to a "fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (quotation omitted). As the employer must ensure the plan is sufficiently capitalized to make these payments, the employer bears all risks related to excessive fees and investment underperformance. *See id.* 439–40. Consequently, defined-benefit-plan employers and fiduciaries have every incentive to keep costs low and remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). As the employee bears all risks related to excessive fees and investment

---

[1] The putative class period is "any time on or after September 14, 2016." *Infra* ¶ 71.
[2] *See* Investment Company Institute, *Retirement Assets Total $33.7 Trillion in Second Quarter 2022* (Sept. 15, 2022), https://www.ici.org/statistical-report/ret_22_q2.
[3] *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply*, at 4 (July 24, 2014), http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx; Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: Data in Brief*, at 4 (last updated Nov. 23, 2021), https://fas.org/sgp/crs/misc/R43439.pdf.

underperformance, the employer has no incentive to keep costs low or remove imprudent investments.

4.     For companies that provide retirement plan investments or services (like Mutual of America), the potential for imprudent and disloyal conduct is especially high because the plan's fiduciaries can benefit the company through their administration of the plan by, for example, using proprietary investments or services that a non-conflicted and objective fiduciary would not choose.

5.     To protect retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B).

6.     Defendants have not acted in participants' best interest. To the contrary, Defendants used the Plan to promote Mutual of America's proprietary services and investments and earn profits for Mutual of America. Throughout the putative class period, Defendants used Mutual of America's proprietary closed-architecture recordkeeping platform, causing participants to pay annual administrative fees roughly *ten times higher* than what participants would have paid for administrative services had Defendants diligently investigated the marketplace and hired a third-party recordkeeper to provide either the same set of services or services of superior quality.

7.     The use of Mutual of America's closed-architecture recordkeeping platform was advantageous to Mutual of America in other ways as well, as its platform is filled with Mutual of America's proprietary investments. Indeed, as of the end of 2020, Defendants stocked the Plan's investment menu with 29 proprietary investments: 1 proprietary fixed interest account and 28

proprietary mutual funds. A prudent and objective review of comparable investments in the marketplace would have revealed numerous available investments that were less costly and superior to the Mutual of America Funds that Defendants selected and retained in the Plan. But instead of investing in any of these competitive fund offerings in the marketplace, Defendants invested in its proprietary funds, which charged fees far more than similar marketplace alternatives that were available. Defendants' decision generated significant profits for Mutual of America.

8.      Defendants' imprudent and disloyal conduct has cost the Plan and its participants millions of dollars in excessive fees and lost investment returns since the start of the putative class period.

9.      Based on Defendants' actions and omissions, Plaintiffs assert claims against Defendants for breaching their fiduciary duties of loyalty and prudence (Count One), and against Mutual of America for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with their breaches or the Plan's assets, and other appropriate relief.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) and (3), which permit participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

11.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

12.    Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

13.    Plaintiff Eric Goldstein resides in New York, New York. He has participated in the Plan since 2005 and is a current participant. As a Plan participant, he has paid excessive administrative expenses during the putative class period. Plaintiff Goldstein has also been invested in at least the Mutual of America Mid-Cap Equity Index fund, Mutual of America Small Cap Growth fund, Mutual of America Aggressive Allocation fund, Mutual of America Small Cap Value fund, and Mutual of America Moderate Allocation fund during the putative class period. As a result, he has been financially injured by Defendants' unlawful conduct. Plaintiff Goldstein's account would be worth more today had Defendants not violated ERISA as described herein.

14.    Plaintiff Matt Sudol resides in Ridgewood, New Jersey. He was a participant in the Plan from approximately 2016 until 2022. As a Plan participant, he has paid excessive administrative expenses during the putative class period. Plaintiff Sudol has also been invested in at least the Mutual of America 2040 Retirement fund, Mutual of America All America fund, Mutual of America Equity Index fund, the Mutual of America Aggressive Allocation fund, the Mutual of America Bond fund, and the Mutual of America Moderate Allocation fund during the putative class period. As a result, he has been financially injured by Defendants' unlawful conduct. Plaintiff Sudol's account would be worth more today had Defendants  not violated ERISA as described herein.

15.    Plaintiff Bonnie Zelazek resides in Lake Worth, Florida. She was a participant in the Plan from approximately 1988 until 2021. As a Plan participant, she paid excessive

administrative expenses during the putative class period. Plaintiff Zelazek was also invested in at least the Mutual of America All America fund, Mutual of America Equity Index fund, Mutual of America Mid-Cap Equity Index fund, Mutual of America Small Cap Growth fund, and Mutual of America Small Cap Value fund during the putative class period. As a result, she has been financially injured by Defendants' unlawful conduct. Plaintiff Zelazek's account would have been worth more at the time it was distributed from the Plan Defendants not violated ERISA as described herein.

**THE PLAN**

16.     The Plan was established on July 1, 1985.

17.     The Plan covers eligible employees and former employees of Mutual of America.

18.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

19.     From 2016 through the end of 2021 (the last year for which data is publicly available), the Plan had between 1,800 and 2,000 participants and approximately $274 million to $471 million in assets.

20.     Plan participants may direct their accounts to one or more investments selected by the Plan's fiduciaries. From at least 2016 through 2021, the Plan's investments were held in a group annuity contract administered by Mutual of America. Almost all of these investments were mutual funds held within a group annuity subaccount vehicle, which is also sometimes referred to as a separate account. The exception to this is the Mutual of America's proprietary fixed interest account.

21.     On December 1, 2021, the Plan terminated its group annuity contract with Mutual of America and signed a new contract with Mutual of America that adopted a net asset value

(NAV) platform. As a result, the Plan's investments are no longer held in a group annuity contract that invests in shares of the Plan's mutual funds, but instead the Plan directly invests in the underlying mutual funds.

22.     As of the end of 2016, the Plan's investment menu consisted of 40 investments, 26 of which were proprietary Mutual of America funds (including a suite of proprietary target date funds and index funds).[4] From 2016 until 2020, Mutual of America did not remove a single one of these 26 proprietary investments from the Plan's menu. In fact, it added 3 additional proprietary investments,[5] as well as some non-proprietary investments. So, by the end of 2020, the Plan's menu consisted of 50 investments including 29 proprietary Mutual of America funds.

23.     Plan participants pay expenses associated with administering the Plan, including recordkeeping and administrative fees. One way that participants pay these fees is through a charge (a percentage of the participant's assets in the plan), which is added on top of the expense ratio associated with the Plan's investments. Certain participants also paid a monthly fee intended to cover part of the cost of administering the Plan's group annuity contract and each participant's account.

## DEFENDANTS

### *Mutual of America Life Insurance Company*

24.     Mutual of America is an insurance company headquartered and incorporated in New York. Mutual of America also provides retirement plan services to the small retirement plan market, including many small non-profit companies.

---

[4] The Plan's investment menu in 2015 was identical to its 2016 investment menu except that the Mutual of America 2055 target date fund was not yet available.
[5] The Mutual of America Small Cap Equity Index Fund was added in 2018, the Mutual of America 2060 Retirement Fund was added in 2018, and the Mutual of America 2065 Retirement Fund was added in 2020.

25.     The Plan's Forms 5500 (filed with the United States Department of Labor) identify Mutual of America as the plan sponsor. *See* 29 U.S.C. § 1002(16)(B) (defining plan sponsor). As the plan sponsor, Mutual of America has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Mutual of America exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

26.     The Plan's Forms 5500 also identify Mutual of America as the plan administrator. *See* 29 U.S.C. § 1002(16)(A) (defining plan administrator). As the plan administrator, Mutual of America is a named fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

27.     To the extent that Mutual of America has delegated any of its fiduciary functions to others, such as the Committee, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power." (quotation omitted)).

*The Mutual of America Investment Manager Committee*

28.    The Committee assists Mutual of America with selection, monitoring, and oversight of the Plan's investments and their expenses. Because the Committee exercised discretionary authority or discretionary control with respect to management and administration of the Plan, it was a functional fiduciary under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Liss*, 991 F. Supp. at 310.

29.    To the extent that the Committee delegated any of its fiduciary functions to others, it maintained fiduciary responsibilities with respect to the Plan. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali*, 308 F. Supp. 3d at 691.

30.    Defendants John and Jane Does 1-20 ("Doe Defendants") are or were members of the Committee during the statutory period. Each of the Doe Defendants are also fiduciaries under 29 U.S.C. § 1002(21)(A). The identities of all the Doe Defendants are not currently known to Plaintiffs.

31.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## LEGAL AND FACTUAL BACKGROUND

### ERISA FIDUCIARY DUTIES

32.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

9

(A)     for the exclusive purpose of

    (i)     providing benefits to participants and their beneficiaries; and

    (ii)     defraying reasonable expenses of administering the plan;

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

33.     These ERISA fiduciary duties are "the highest known to the law." *Donovan*, 680 F.2d at 272 n.8. "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 339 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020).

## DUTY OF LOYALTY

34.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan*, 680 F.2d at 271). "Perhaps the most fundamental duty of a [fiduciary] is that [it] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

"Breaches of the unwavering duty of loyalty occur when a fiduciary deviates from that single-minded devotion, placing its interests … above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (quotation omitted).

### DUTY OF PRUDENCE

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). "[A] fiduciary's conduct at all times must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *Sweda*, 923 F.3d at 333 (quotation omitted). "[I]f there is indeed a 'hallmark' of fiduciary activity identified in the statute, it is prudence." *Id.*

36.     The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); *see also Vellali*, 308 F. Supp. 3d at 683 ("Fiduciaries have a continuing duty … to monitor investments and remove imprudent ones." (quotation omitted)). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). The duty of prudence necessarily entails consideration of investment costs. *See Sweda*, 923 F.3d at 328-29 ("Fiduciaries must … consider a plan's power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." (quotation omitted)).

### DUTY TO MINIMIZE COSTS

37.     At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "The process of selecting vendors and

11

negotiating service fees can materially affect an employee's retirement income because every dollar spent on either recordkeeping or investment management is a dollar that is not contributing to increasing the amount of the employee's retirement savings. Over time, excessive service fees can erode an employee's retirement savings" to the tune of tens or hundreds of thousands of dollars. *Vellali*, 308 F. Supp. 3d at 678.[6]

38.     To protect retirement plan participants, ERISA requires plan fiduciaries to monitor administrative expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d at 328 ("Fiduciaries must … understand and monitor plan expenses."); *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *5 (D. Conn. Apr. 18, 2022) ("[A] plan fiduciary's duty of prudence incorporates an ongoing duty to monitor the prudence of investment options and recordkeeping fees, in order to be cost-conscious in administering their duties."); *accord* Restatement (Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious.").[7]

39.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses, including recordkeeping fees, should be determined by

---

[6] The DOL and SEC have also warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2 (2013), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

[7] The legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (Plaintiffs sufficiently alleged that administrative expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties." (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005))).

40.    A fiduciary may breach its duties by authorizing higher-than-market administrative fees or maintaining a recordkeeping deal for its own benefit. *See Vellali*, 308 F. Supp. 3d at 685 (denying a motion to dismiss where the complaint alleged defendants' failures caused excessive administrative fees); *Carrigan*, 2022 WL 1137230, at *5 ("Plaintiffs have plausibly alleged that [d]efendants breached the duty of prudence by retaining affiliated recordkeepers that charged excessive fees under circumstances that would have alerted a reasonably prudent fiduciary of the need to investigate further.").

## DEFENDANTS' VIOLATIONS OF ERISA

**I.    DEFENDANTS USED MUTUAL OF AMERICA'S PROPRIETARY RECORDKEEPING PLATFORM TO GENERATE PROFITS FOR MUTUAL OF AMERICA AT PARTICIPANTS' EXPENSE AND FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S ADMINISTRATIVE EXPENSES**

41.    Defendants caused the Plan's participants to pay excessive administrative expenses during the putative class period.

42.    Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of a plan's largest

expenses. Within the world of defined contribution plans, "recordkeeping" is a catch-all term that describes an array of services provided by a plan's primary administrative service provider that includes, but is not limited to, processing and tracking all balances and transactions associated with each participant's account; updating account balances daily; providing a web portal to participants providing them with up-to-date account, investment, and financial planning information; providing communications to participants including periodic account statements and required disclosures; processing participant loans; affording employees various financial education opportunities; compliance testing for the plan; Form 5500 preparation; preparing financial statements; and furnishing the Plan's fiduciaries with participant and investment information to assist with their administration of the plan. In this case, the administrative fees charged to participants additionally cover the cost of administering the Plan's group annuity contract.

43.    Among large plans, the market for recordkeeping services is highly competitive, with many recordkeepers equally capable of providing a high-level service. Although recordkeepers try to differentiate themselves to compete for business, they all offer essentially the same bundle of administrative services. Accordingly, recordkeepers vigorously compete for business by offering the best price. As a result of such competition, recordkeeping fees have declined in defined contribution plans over time. Between 2006 and 2016, recordkeeping costs dropped by approximately 50% on a per-participant basis and have continued to decline since then.[8]

---

[8] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019), https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC.");

44.    The cost of administrative services is driven primarily by the size of the plan—not the services offered (as all major recordkeepers provide similar administrative services). As the cost of providing recordkeeping services depends on the number of participants in a plan, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. As noted above, the Plan has had between 1,800 and 2,000 participants and approximately $274 million to $471 million in assets during the putative class period. Given its size, the Plan had significant leverage to negotiate recordkeeping and other administrative expenses.

45.    A defined contribution plan can be recordkept using either an open or a closed architecture recordkeeping platform. Nearly every major recordkeeper in the marketplace offers an open-architecture platform, which allows for plan fiduciaries to build a plan's investment menu by selecting from any of the thousands of mutual funds and collective investment trusts in the marketplace. Mutual of America, however, offers a closed-architecture recordkeeping platform to its clients. This closed-architecture recordkeeping platform limits a plan's investment menu to the approximately 50 investment options that Mutual of America makes available, the bulk of which are Mutual of America proprietary investments. While it is not per se imprudent to use a proprietary closed-architecture recordkeeping platform, plan fiduciaries must monitor and control recordkeeping expenses, which includes investigating the recordkeeping options available to a plan.

46.    Typically, service providers charge for recordkeeping and related administrative services either on a per-participant fee basis (a fee based on the number of participants in the plan)

---

Robert Steyer, *Record-keeping Consolidation Expected to Continue*, Pensions & Investments (Oct. 22, 2020) (noting the continued declines in recordkeeping expenses).

or as an asset-based fee (a fee based on a percentage of the total assets in the plan). Asset-based fee arrangements are more common for smaller defined contribution plans, which have less leverage to negotiate how services are charged. Regardless of how these fees are charged, the cost of these services is typically borne by the plan participants. So, it is important for plan fiduciaries to closely monitor these expenses to ensure that participants are not being overcharged. *See supra* at 11-13.

47.    From at least 2016 through 2021, the Plan's annual administrative and recordkeeping fees were a combination of a monthly fee charged to certain participants' accounts as well as a 0.25% (25 bps) asset-based fee added onto the expense ratio of each of the Plan's investments. And, during that time, Defendants used Mutual of America's proprietary closed-architecture recordkeeping platform for the Plan. By selecting Mutual of America as the Plan's recordkeeper, Mutual of America benefitted from the Plan's administration. But Defendants' selection severely limited the Plan's investment menu and caused plan participants to pay excessive administrative expenses during the putative class period.

48.    Specifically, in 2016, Defendants caused plan participants to pay a total average annual administrative and recordkeeping fee of approximately $350 per person. And, by 2020, participants were paying a total average of approximately $500 per person, which was up to *ten times higher* than what participants would have paid for administrative services had Defendants diligently investigated the marketplace options and hired a third-party recordkeeper to provide either the same set of services or services of superior quality.

49.    Based on Plaintiffs' investigation, a prudent and loyal fiduciary of a similarly sized plan could have obtained comparable administrative services of like or superior quality for approximately $50-80 per participant (or less) at that time from recordkeepers such as Fidelity,

Vanguard, Prudential, Wells Fargo, or Charles Schwab. These recordkeepers are all capable of providing comparable recordkeeping services at lower rates than Mutual of America. It was not prudent or in the best interest of participants to allow the Plan to be charged up to ten times more than this amount.

50.    Numerous similarly sized plans paid administrative fees of $80 per participant or less between 2016 and 2021, including the plans in the following table:

| Plan | Year | Administrative Fee ($/pp) | Participants | Plan Assets | Recordkeeper |
|---|---|---|---|---|---|
| Lazard Freres & Co. LLC Employees' Savings Plan | 2022[9] | $72 | 2,374 | $659,256,264 | Fidelity |
| Tennant Company Retirement Savings Plan | 2021 | $63 | 2,746 | $472,012,896 | Fidelity |
| Matthews International Corporation 401(k) Plan | 2019 | $50 | 5,169 | $371,489,520 | Wells Fargo |
| Faith Technologies, Inc. 401(k) Retirement Plan | 2019 | $74.49 | 3,435 | $232,619,231 | Prudential |
| Gates Matchmaker Plan | 2017 | $50 | 5,744 | $591,967,178 | Charles Schwab |

51.    These plans are reasonable comparators, in part, because they are similar in size to the Plan both based on participant count and total plan assets.

52.    These comparisons are not isolated, cherry-picked examples. A 2020 study by NEPC, LLC, a leading industry consultant, shows that the median rate for recordkeeping, trust, and custodial services for plans of comparable size (i.e. 1,000 to 5,000 participants) is approximately $68 per participant.[10] On the extreme upper and lower ends, plans in the 95th percentile paid approximately $100 per participant and plans in the 5th percentile paid around $30

---

[9] The administrative fee is from the plan's 2022 fee disclosure, but the figures for participants and plan assets are from the plan's 2021 Form 5500.

[10]    *NEPC 2020 Defined Contribution Progress Report*, NEPC at 12 (2020), https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Sur vey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf. Expressed as a percentage of plan assets, the median rate for plans in this cohort was 0.07% or 7 bps.

per participant.[11] The vast majority of comparably sized plans—greater than 75% of them—paid $80 or less per participant.[12] Thus, as NEPC notes, while "operational complexity and service levels" can drive "meaningful differentiation in price," this differentiation exists within well-defined boundaries, with the vast majority of plans paying less than $80 per participant and the most administratively complex plans that are receiving the highest levels of service still paying no more than $100 per participant (or less).[13] The fees paid by the Plan to Mutual of America, amounting to several times the upper bound of fees paid by a universe comparable plans, strongly suggest that Defendants' self-interest has supplanted their fiduciary obligation to the Plan and its participants.

53.     A prudent and loyal fiduciary would not have allowed participants to pay these excessive amounts for administrative and recordkeeping services. As part of a prudent fiduciary process, fiduciaries regularly monitor the amount of administrative expenses that are being paid and conduct periodic cost benchmarking to determine whether those amounts are consistent with the amounts paid by other similarly sized plans. The NEPC survey notes that the "[b]est practice is to compare fees and services through a record-keeping vendor search Request for Proposal ('RFP') process"[14] and the Department of Labor has observed that most plan fiduciaries conduct an RFP every three to five years.[15] Based on the excessive amounts participants paid for administrative services, the length of time they did so, and the self-interest at play, it is reasonable

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, Department of Labor Federal Register, 2010 WL 2785735, 41625 (July 16, 2010) ("The Department also assumes that changes in plan disclosures will occur at least once every three years, because plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years.").

to infer that Defendants failed to take these measures or to leverage its size to negotiate reasonable fees for administrative and recordkeeping services.

## II.   DEFENDANTS' PROCESS FOR SELECTING AND MONITORING INVESTMENTS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST

54.   Although including proprietary options in a plan's investment menu is not a per se breach of the duty of prudence or loyalty, a fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties that apply to the selection and monitoring of other investments. Based on Defendants' retention of proprietary funds in lieu of less expensive and otherwise superior nonproprietary fund alternatives, it is reasonable to infer that Defendants' process for selecting and monitoring the Mutual of America Funds was imprudent and disloyal.

55.   Each of the Mutual of America Funds charge an annual operating expense that is paid to Mutual of America and deducted from the rate of return of the fund. In addition to receiving these investment management fees, and because the Mutual of America Funds are structured as separate accounts, Mutual of America also claims a tax deduction called the Dividend Received Deduction ("DRD") on dividends received on the assets owned by Mutual of America on behalf of the Plan. *See* 26 U.S.C. § 243. For insurance companies with large separate accounts such as Mutual of America, this DRD tax benefit can be worth millions of dollars. If Defendants had not invested the Plan's assets in the Mutual of America Funds, Mutual of America would have received significantly less money from investment management fees and the DRD tax benefit.

56.   Throughout the putative class period, Defendants acted with blind preference for the proprietary Mutual of America funds. For each year from 2015 through 2021, Defendants included every single fund offered by Mutual of America in the Plan. And for funds that were

created during the putative class period,[16] they added those proprietary funds to the Plan's menu shortly after their inception. Defendants' reckless use of Plan assets to seed new proprietary funds has harmed Plan participants. *See Williams v. Centerra Grp., LLC*, 2021 WL 4227384, at *6 (D.S.C. Sept. 16, 2021) (allegations that defendant selected proprietary funds for the plan because they "bolstered [defendant's] investment management business" and provided "seed money" that defendant benefited from stated a claim for the breach of the duty of loyalty); *Miller v. Astellas US LLC*, 2021 WL 1387948, at *6 (N.D. Ill. Apr. 13, 2021) (allegations that inclusion of proprietary funds in the plan benefited defendant by "receipt of hundreds of millions of dollars in [p]lan assets as 'seed money'" for defendant's investment management business stated a claim for breach of the duty of loyalty). This pattern of behavior establishes that at all relevant times Defendants have operated under a uniform Plan-wide policy of including every Mutual of America fund in the Plan, regardless of its merits. In contrast, a prudent and loyal fiduciary would objectively engage in an individualized, fund-by-fund analysis of the suitability (or not) for the Plan of each proprietary fund in light of readily available non-proprietary alternatives.

57.     As shown by the charts below, the actively managed Mutual of America Funds are considerably more expensive than readily available marketplace alternatives.[17] In 2018, the most recent year for which average fee data is available, the actively managed Mutual of America Funds

---

[16] The Mutual of America Small Cap Equity Index fund was created on July 2, 2018 and added to the Plan in 2018. The Mutual of America Catholic Values Index fund was created on September 30, 2020 and added to the Plan in 2021.

[17] Actively managed Mutual of America Funds exclude the Mutual of America funds which employ, in part or in whole, passively managed strategies. This includes the Mutual of America target date funds, Mutual of America Conservative Allocation fund, Mutual of America Moderate Allocation fund, Mutual of America Aggressive Allocation fund, Mutual of America All America fund, Mutual of America International fund, Mutual of America Mutual of America Equity Index fund, Mutual of America Mid-Cap Equity index fund, and Mutual of America Small-Cap Equity index fund.

exceeded the average expense ratio for funds within the same asset class category among plans with $250 million to $500 million in assets by as much as 93%.[18] When looking solely at leading actively managed funds invested in similar styles to the actively managed Mutual of America Funds, the excessive fees reach as high as 36% above average:

---

[18] The expenses listed for Mutual of America Funds exclude any asset-based administrative fees added to each Fund's expense ratio. That is, the Mutual of America Funds' fees are excessive even when focusing solely on the portion of the Funds' expense ratios represented by the annual report and/or prospectus net expense ratios. The actual expense ratios paid by participants investing in the Mutual of America Funds are approximately 0.25% *higher* than illustrated here.

| Proprietary Fund | ICI/BrightScope Category / Morningstar Global Category | Fund Net Expense Ratio (2018) | Average 401(k) Fund Expense Ratio (2018) | Percentage Fee Excess Over 401(k) Average | Average Actively Managed Expense Ratio (2018)[19] | Percentage Fee Excess Over Actively Managed Average |
|---|---|---|---|---|---|---|
| **Mutual of America Composite** | Non-Target Date Balanced / Moderate Allocation | 0.51% | 0.39% | 31% | 0.56% | -9% |
| **Mutual of America Bond** | Domestic Bond / U.S. Fixed Income | 0.45% | 0.34% | 32% | 0.33% | 36% |
| **Mutual of America Mid Cap Value** | Domestic Equity / U.S. Equity Mid Cap | 0.65% | 0.42% | 55% | 0.62% | 5% |
| **Mutual of America Mid-Term Bond** | Domestic Bond / U.S. Fixed Income | 0.45% | 0.34% | 32% | 0.33% | 36% |
| **Mutual of America Small Cap Growth** | Domestic Equity / U.S. Equity Small Cap | 0.81% | 0.42% | 93% | 0.67% | 21% |
| **Mutual of America Small Cap Value** | Domestic Equity / U.S. Equity Small Cap | 0.81% | 0.42% | 93% | 0.67% | 21% |

58.    The Mutual of America Funds' excessive fees extend to the Plan's passively managed investments as well.[20] Less expensive index mutual funds designed to track the exact same prospectus benchmarks as the Mutual of America index funds were available throughout the putative class period:

---

[19] The "Actively Managed Average Expense Ratio" consists of the average annual report expense ratio of the least expensive share class of the twenty largest actively managed mutual funds by assets under management managed in a similar investment style. Averages are calculated separately for moderate allocation, U.S. fixed income, U.S. equity mid cap, and U.S. equity small cap Morningstar Global Categories.

[20] The Mutual of America Funds' net expense ratios shown exclude any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

| Index Fund | Prospectus Benchmark | Fund Net Expense Ratio (Current) |
|---|---|---|
| **Large Cap Equity Index Fund** | | |
| **Mutual of America Equity Index** | S&P 500 TR USD | 0.14% |
| **Vanguard Institutional Index I** | S&P 500 TR USD | 0.035% |
| **Mid-Cap Equity Index Fund** | | |
| **Mutual of America Mid-Cap Equity Index** | S&P MidCap 400 TR USD | 0.15% |
| **Vanguard S&P Mid-Cap 400 Index I** | S&P MidCap 400 TR USD | 0.08% |
| **Small Cap Equity Index Fund** | | |
| **Mutual of America Small-Cap Equity Index** | S&P SmallCap 600 TR USD | 0.15% |
| **Vanguard S&P Small-Cap 600 Index I** | S&P SmallCap 600 TR USD | 0.08% |

59.     In large part because of the high fees charged by the Mutual of America Funds, those investments tended to underperform, costing the Plan millions of dollars in lost benefits that participants otherwise would have had in their accounts if the Plan's investments had been managed in a prudent and loyal manner. One example of an imprudently retained fund is the Mutual of America Small Cap Growth fund, which has been in the Plan throughout the putative class period. Leading up to and throughout the relevant period, this fund has consistently and materially trailed its prospectus benchmark as well as less expensive funds that share the same prospectus benchmark and employ similar investment objectives and risk.[21] Yet, Defendants never removed it from the Plan:

---

[21] That is, each fund's prospectus benchmark is the Russell 2000 Growth index, each fund falls within the Small Cap Growth Morningstar Category, each fund is actively managed, each fund carries an investment objective of seeking capital appreciation by investing in the securities of small U.S. companies that their respective managers believe possess the potential for growth, and each fund invests in fewer than 150 stocks while concentrating between 15% and 30% of their assets in their respective top ten holdings.

| Fund | Net Expense Ratio (Current) | 2015 (10-Year Return) | 2016 (10-Year Return) | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) |
|---|---|---|---|---|---|---|---|---|
| **Mutual of America Small Cap Growth** | 0.81%[22] | 7.30% | 6.63% | 8.44% | 11.60% | 11.50% | 12.31% | 13.68% |
| *Russell 2000 Growth TR USD* | *n/a* | *7.95%* | *7.76%* | *9.19%* | *13.52%* | *13.01%* | *13.48%* | *14.14%* |
| **ClearBridge Small Cap Growth IS** | 0.77% | 8.69% | 8.07% | 9.54% | 15.93% | 14.45% | 16.00% | 17.23% |
| **Invesco Discovery R6** | 0.63% | 8.79% | 8.77% | 9.10% | 14.18% | 15.05% | 16.96% | 17.75% |
| **JPMorgan Small Cap Growth R6** | 0.74% | 8.20% | 7.46% | 10.00% | 15.89% | 15.82% | 17.90% | 17.60% |

60.    Comparing the funds' alpha[23] shows that the Mutual of America Small Cap Growth fund's underperformance was caused by its managers' lack of skill—rather than the fund's risk profile:

---

[22] The Mutual of America Small Cap Growth fund's net expense ratio shown excludes any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

[23] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. *See* Investopedia, *Alpha*, https://www.investopedia.com/terms/a/alpha.asp (last visited Sep. 13, 2022).

| Fund | 2015 (10-Year Alpha) [24] | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha) |
|---|---|---|---|---|---|---|---|
| Mutual of America Small Cap Growth | -0.11 | -0.55 | 0.00 | -0.61 | -0.52 | -0.11 | 0.60 |
| ClearBridge Small Cap Growth IS | 1.22 | 0.84 | 1.04 | 3.49 | 2.31 | 3.04 | 3.40 |
| Invesco Discovery R6 | 1.55 | 1.82 | 1.05 | 2.39 | 3.10 | 4.68 | 5.50 |
| JPMorgan Small Cap Growth R6 | 0.20 | -0.33 | 0.59 | 1.75 | 1.95 | 3.45 | 2.69 |

61.    A prudent fiduciary would have removed the Mutual of America Small Cap Growth fund from the Plan given its significant underperformance leading up to and throughout the putative class period. The fact that Defendants retained this proprietary fund despite its consistent underperformance versus its benchmark and readily available, superior marketplace alternatives supports an inference that Defendants' process for monitoring the Plan's investments was self-interested and imprudent.

62.    Another illustrative example of Defendants' flawed monitoring process is the retention of the Mutual of America Mid Cap Value fund, which has been in the Plan throughout the putative class period. Like the Mutual of America Small Cap Growth fund, the Mutual of America Mid Cap Value fund has failed to keep pace with its prospectus benchmark and similarly

---

[24] Alpha's calculation benchmark is the Russell 2000 Growth TR USD index, which serves as the prospectus benchmark for the Mutual of America Small Cap Growth fund as well as each comparator fund listed.

or less expensive funds that share prospectus benchmarks and employ similar investment objectives and risk:[25]

| Fund | Net Expense Ratio (Current) | 2015 (10-Year Return) | 2016 (10-Year Return) | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) |
|---|---|---|---|---|---|---|---|---|
| Mutual of America Mid Cap Value | 0.65%[26] | 6.01% | 6.03% | 7.42% | 10.07% | 10.22% | 8.63% | 12.13% |
| *Russell Mid Cap Value TR USD* | *n/a* | *7.61%* | *7.59%* | *9.10%* | *13.03%* | *12.41%* | *10.49%* | *13.44%* |
| MFS Mid Cap Value R6 | 0.63% | 7.13% | 7.60% | 8.83% | 13.53% | 12.80% | 10.61% | 13.87% |
| T. Rowe Price Mid Cap Value I | 0.65% | 8.02% | 8.40% | 9.55% | 13.04% | 10.77% | 10.14% | 13.16% |
| Victory Sycamore Established Value R6 | 0.54% | 9.22% | 9.83% | 10.68% | 13.36% | 12.90% | 11.62% | 14.76% |

63.     Likewise, the Mutual of America Mid Cap Value fund's underperformance is caused by its manager's lack of skill—not its risk profile—as exhibited through the fund's inferior alpha:

---

[25] That is, each fund is benchmarked to the Russell Mid Cap Value index, each fund falls within the Mid Cap Value Morningstar Category, each fund is actively managed, each fund carries an investment objective of investing in the securities of mid-sized companies that are believed to be undervalued in the marketplace in relation to their perceived worth, and each fund invests in fewer than 160 stocks while concentrating between 10% and 25% of their assets in their respective top ten holdings.

[26] The Mutual of America Mid Cap Value fund's net expense ratio shown excludes any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

| Fund | 2015 (10-Year Alpha) [27] | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha) |
|---|---|---|---|---|---|---|---|
| Mutual of America Mid Cap Value | -0.59 | -0.51 | -0.28 | -1.06 | -1.25 | -1.17 | -0.65 |
| MFS Mid Cap Value R6 | -0.17 | 0.32 | 0.15 | 1.24 | 0.44 | 0.31 | 0.71 |
| T. Rowe Price Mid Cap Value I | 0.89 | 1.29 | 1.12 | 0.87 | -0.82 | 0.15 | 0.28 |
| Victory Sycamore Established Value R6 | 2.21 | 2.85 | 2.46 | 1.59 | 0.96 | 1.43 | 1.68 |

64.     Yet another example of Defendants' faulty monitoring process is the continued retention of the Mutual of America All America fund, which has been in the Plan throughout the putative class period. The Mutual of America All America fund allocates approximately 60% of its assets in the 500 common stocks included in the S&P 500 index, with the remaining 40% actively managed by the fund's manager. That is, 60% of the fund's assets are invested to mimic the performance of the S&P 500 index, yet the fund still charges fees in excess of *entirely* actively managed alternatives in the marketplace. In a recurring theme, the Mutual of America All America fund has consistently failed to keep pace with its prospectus benchmark and less expensive funds that share prospectus benchmarks and employ similar investment objectives and risk. This fund's strategy of blending passive and active management is wholly ineffective, as it routinely trails both actively and passively managed funds that are benchmarked against the S&P 500 index, fall within

---

[27] Alpha's calculation benchmark is the Russell Mid Cap Value TR USD index, which serves as the prospectus benchmark for the Mutual of America Mid Cap Value fund as well as each comparator fund listed.

27

the Large Blend Morningstar Category, and invest in stocks that are considered undervalued or to have attractive growth potential:[28]

| Fund | Net Expense Ratio (Current) | 2015 (10-Year Return) | 2016 (10-Year Return) | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) |
|---|---|---|---|---|---|---|---|---|
| Mutual of America All America | 0.49%[29] | 6.85% | 6.45% | 7.91% | 11.77% | 12.04% | 11.94% | 14.63% |
| *S&P 500 TR USD* | *n/a* | *7.31%* | *6.95%* | *8.50%* | *13.12%* | *13.56%* | *13.88%* | *16.55%* |
| Vanguard Institutional Index I | 0.035% | 7.31% | 6.95% | 8.50% | 13.11% | 13.53% | 13.86% | 16.52% |
| Hartford Core Equity R6 | 0.36% | 8.19% | 7.53% | 8.83% | 13.86% | 14.58% | 14.97% | 17.36% |
| JPMorgan US Equity R6 | 0.44% | 8.90% | 8.29% | 9.34% | 13.40% | 13.32% | 14.48% | 17.57% |
| Vanguard PRIMECAP Adm | 0.31% | 9.59% | 9.41% | 11.06% | 15.26% | 14.67% | 15.10% | 17.61% |

65.    Again, Mutual of America All America fund's underperformance is due to its manager's lack of skill—not its risk profile—as exhibited through the fund's uniformly inferior alpha:

---

[28] One passively managed comparator, the Vanguard Institutional Index, and three actively managed comparators are included to illustrate Mutual of America All America fund's shortcomings as it relates to both its actively and passively managed components.

[29] The Mutual of America All America fund's net expense ratio shown excludes any amount paid by participants that is intended to cover the Plan's administrative and recordkeeping costs.

| Fund[30] | 2015 (10-Year Alpha) [31] | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha) |
|---|---|---|---|---|---|---|---|
| Mutual of America All America | -0.37 | -0.42 | -0.48 | -1.13 | -1.52 | -2.08 | -1.95 |
| Hartford Core Equity R6 | 1.10 | 0.84 | 0.69 | 1.62 | 1.56 | 1.57 | 1.38 |
| JPMorgan US Equity R6 | 1.43 | 1.18 | 0.67 | -0.25 | -1.02 | -0.09 | 0.17 |
| Vanguard PRIMECAP Adm | 2.28 | 2.44 | 2.50 | 1.81 | 0.44 | 1.06 | 1.33 |

66.     The foregoing examples are illustrative of the overall struggles within the Mutual of America Funds generally. Defendants failed to adequately investigate these superior marketplace alternatives when selecting and retaining funds for the Plan, choosing instead to use the Mutual of America Funds to further Mutual of America's interests. Defendants chose these proprietary funds even though they charged fees that were significantly higher than the fees charged by more competitive options that employed similar investment strategies and were managed in a similar style. Indeed, the excessive fees charged by the Mutual of America actively managed funds were higher when compared to other comparable actively managed funds, and the Mutual of America index funds were higher when compared to other index funds tracking identical prospectus benchmarks. If Defendants had been monitoring fund expenses and performance while investigating marketplace alternatives consistent with the practice of other fiduciaries of 401(k)

---

[30] Vanguard Institutional Index fund's alpha is omitted, as it is a passively managed investment that seeks to replicate the returns of the S&P 500 index.

[31] Alpha's calculation benchmark is the S&P 500 TR USD index, which serves as the prospectus benchmark for the Mutual of America All America fund as well as each comparator fund listed.

plans, then they would have replaced the Mutual of America Funds with more competitive marketplace alternatives, like those listed above, all of which were available to Defendants.

67.    The high fees and poor performance of the Mutual of America Funds has rightfully led other similarly sized plan fiduciaries to look elsewhere for investment options available to their respective participants. For example, of the 3,967 defined contribution plans with at least $250 million in assets—like the Plan—only twelve additional plans hold a single Mutual of America fund. Of those twelve plans, no plan has allocated more than approximately 5% of its assets to Mutual of America funds, with the median allocation totaling a paltry 0.20% of plan assets. In stark contrast, the Mutual of America Funds comprise nearly *two-thirds* of total Plan assets.

68.    A prudent and loyal fiduciary would have removed the Mutual of America Funds from the Plan. By retaining the Mutual of America Funds and failing to investigate superior, lower-cost alternatives in the marketplace, Defendants have breached their fiduciary duties of loyalty and prudence.

## III.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

69.    Until shortly before this suit was filed, Plaintiffs did not know all of the material facts (including, among other things, the investment options and menu choices of fiduciaries of similarly sized plans, the costs of the Plan's investments compared to those in similarly sized plans, the availability of superior investment options, the cost of the Plan's administrative or recordkeeping services compared to similarly sized plans, and the Plan's leverage to negotiate lower administrative expenses) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing

Plan investments, Defendants' process for selecting and monitoring the Plan's service providers and monitoring the Plan's administrative expenses, and Mutual of America's process for monitoring Plan fiduciaries) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs seek certification of this action as a class action under Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. § 1109 and 1132(a)(2).

71.     Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[32]

> All participants and beneficiaries of the Mutual of America Life Insurance Company Savings Plan who were invested in the Mutual of America Funds at any time on or after September 14, 2016, excluding any persons with responsibility for the Plan's administrative functions or investments.

72.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 1,800 and 2,000 participants at all relevant times during the applicable period, many of whom were invested in the Mutual of America Funds.

73.     Typicality:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered financial harm because of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

---

[32] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

74.     Adequacy:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

75.     Commonality: Common legal and factual questions exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Defendants are  fiduciaries with respect to the Plan;

    b.  Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c.  Whether Mutual of America breached its duty to monitor other Plan fiduciaries, like the Committee and its members;

    d.  The proper form of equitable and injunctive relief; and

    e.  The proper measure of monetary relief.

76.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

77.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective

equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

78.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applies uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will remove the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B) (against all Defendants)**

79.    As alleged above, Defendants are a fiduciary with respect to the Plan and are subject to ERISA's fiduciary duties.

80.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan; their selection and monitoring of

the Plan's investments; their selection and monitoring of the Plan's recordkeeping platform; and their monitoring and control of the Plan's administrative expenses.

81.    Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants caused the Plan to pay excessive administrative fees and failed to properly monitor and control administrative expenses, retaining a proprietary recordkeeping platform because doing so was in Mutual of America's financial interest. Defendants also failed to employ a prudent and loyal process for selecting, monitoring, and removing the Mutual of America Funds and gave an improper and unjustified preference to these funds over superior, less expensive alternative available options.

82.    Instead of acting in Plan participants' best interest, Defendants' conduct was propelled by a desire to drive revenues and profits to Mutual of America, and to promote Mutual of America's business interests. Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the interest of Plan participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

83.    Further, each of the actions and omissions described in paragraphs 81-82 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

84.     Because of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses throughout the putative class period.

85.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from these fiduciary breaches, and to restore to the Plan any profits (including any DRD benefit) that Defendants captured through the use of Plan assets or which resulted from such fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## COUNT II
### Failure to Monitor Fiduciaries (against Mutual of America)

86.     As alleged throughout the Complaint, Mutual of America is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

87.     Because it has overall oversight responsibility for the Plan and the specific responsibility to appoint and remove members of the Committee, Mutual of America has a fiduciary responsibility to monitor the performance of Committee, and its members and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Liss*, 991 F. Supp. at 310; *Vellali*, 308 F. Supp. 3d at 691

88.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to selection and oversight of service providers to the Plan and the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

89.     Mutual of America breached its fiduciary monitoring duties by, among other things:

   a.   Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant

losses as a result of the Committee's imprudent actions and omissions with

respect to the Plan;

b.  Failing to monitor the Committee's fiduciary processes, which would have

alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

and

c.  Failing to remove members of the Committee whose performance was

inadequate in that they continued to allow the Plan to pay excessive costs for

administrative services and maintained imprudent, excessively costly, and

poorly performing fund investments within the Plan, all to the detriment of the

Plan and Plan participants' retirement savings.

90.    As a consequence of the foregoing breaches of the duty to monitor, the Plan

suffered millions of dollars of losses due to excessive fees and investment underperformance.

91.    Under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Mutual of America is

liable to restore to the Plan all losses suffered as a result of their failure to properly monitor the

Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify the

fiduciary breaches described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Goldstein, Sudol, and Zelazek, individually and as

representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants breached their fiduciary duties under ERISA;

D.      A declaration the Mutual of America breached its fiduciary monitoring duties under ERISA;

E.      An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred because of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F.      An accounting for profits earned by Defendants, and a subsequent order requiring Defendants to disgorge all profits received from, or in respect of, the Plan;

G.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Defendants because of Defendants' unlawful conduct in violation of ERISA, or a surcharge against Defendants to prevent unjust enrichment from unlawful conduct involving the Plan;

H.      An order enjoining Defendants from any further violations of ERISA;

I.      An order requiring replacement of certain investments in the Plan;

J.      An order requiring removal of certain investments from the Plan;

K.      An order requiring removal of the Plan's fiduciaries and replacement with an independent fiduciary;

L.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

M.      An award of pre-judgment interest;

N.      An award of attorneys' fees and costs under 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

O.      An award of such other and further relief as the Court deems equitable and just.

Dated: December 1, 2022                         **NICHOLS KASTER, PLLP**

By: s/ Paul J. Lukas
Paul J. Lukas, NY Bar No. 4522207
Brock J. Specht, MN Bar No. 0388343*
Grace I. Chanin, MN Bar No. 0399969*
* admitted *pro hac vice*

4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bspecht@nka.com
gchanin@nka.com